RAYMOND CINMAN *et al.*, Plaintiffs-Appellees, v. RELIANCE FEDERAL
SAVINGS AND LOAN ASSOCIATION, Defendant-Appellant.

First District (3rd Division)   No. 85—3093

Opinion filed March 18, 1987.—Rehearing denied May 19, 1987.

Michael W. Rathsack, of Chicago (William R. Galliani, of counsel), for
appellant.

Brown & Shinitzky, of Chicago (Ronald M. Brown and John P. Schmidt,
of counsel), for appellees Raymond Cinman and Eugene Brodsky.

Fred Sudak & Associates, of Chicago, for appellee DeMoon Realty, Inc.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs Raymond Cinman and Eugene Brodsky brought this action against defendant Reliance Federal Savings and Loan for specific performance of an alleged contract for sale of a building owned by Reliance. Plaintiff DeMoon Realty, Inc., filed suit against Reliance for a real estate broker's commission allegedly due and owing because it produced a buyer who was ready, willing, and able to consummate that sale. The two matters were consolidated for trial before Judge Reginald Holzer. Plaintiffs maintained that a letter, dated February 25, 1981, constituted a contract for the sale of the property in the amount of $1,620,000. Reliance countered that the letter was simply evidence of preliminary negotiations and that no contract came into existence. At the conclusion of plaintiffs' case in a trial without a jury, the trial court granted Reliance's motion to dismiss Brodsky as a plaintiff, and he is not involved in this appeal. At the conclusion of the case, the trial court found that the aforesaid letter did constitute a binding contract and it ordered Reliance to specifically perform according to the terms of that contract. The court also awarded DeMoon a commission of $45,000. Thereafter, DeMoon filed a motion for reconsideration of the amount of its award. The matter had been transferred to Judge Brian Duff, and, after a hearing but without taking evidence, Judge Duff granted DeMoon's motion for reconsideration and increased its award to $162,000.

On appeal, Reliance contends that the court erred in awarding specific performance because the letter of February 25, 1981, did not constitute a valid contract and because Cinman failed to provide an acceptable contract and other necessary documents to Reliance. Reliance also contends that DeMoon was not entitled to receive a broker's commission because no contract for sale was concluded. Reliance argues in the alternative that the trial court erred in increasing DeMoon's commission award of $45,000 to $162,000.

Reliance was a savings and loan association which was having serious financial problems in 1980. The institution's net reserves were being depleted by the high cost of its operations. Reliance's primary office was located in a building in Streamwood, Illinois. The building, which is the subject matter of this litigation, was a major asset of Reliance. Tenants in the building included a dentist, an employment agency, and a mortgage company. Because of Reliance's poor financial condition, the Federal Savings and Loan Insurance Commission was contemplating a forced merger between Reliance and another institution. Reliance had also been under supervision by the Federal Home

Loan Bank Board (FHLBB) for several years. Pursuant to that supervision, Reliance could not make loans in excess of $100,000 and could not dispose of any assets without first obtaining permission from the Federal authorities. Subsequent to the negotiations involved here, Reliance was merged with another savings and loan institution.

In early 1980, Reliance's board of directors authorized its president, Edward Ross, to procure a purchaser for the main office building. Reliance intended to sell the building and property to the purchaser and then lease the building back from the purchaser in a sale and leaseback arrangement. At that time, Carl DeMoon, owner of DeMoon, was a member of the board of directors of Reliance. Carl DeMoon attended several meetings with the other directors at the FHLBB in Chicago. Because of the information he had received at these meetings, Carl DeMoon was aware that in order to sell the Streamwood property, the sale would require ratification by the Federal authorities. Carl DeMoon resigned as a director of Reliance in September 1980 because he wished to become involved in locating a buyer for the Reliance property. He testified that Ross asked him to act as the broker in the sale of the Reliance property.

Cinman first became interested in the Reliance property in October 1980. Eugene Brodsky was Cinman's business partner. On December 10, 1980, Brodsky gave a written power of attorney to Cinman regarding the purchase of the property. Brodsky furnished the money while Cinman was to supply the expertise, and the two men were to be equal partners. After Cinman met with Ross, there were several meetings among Cinman and his broker, Saul Pulia, and Christine Caliendo, a broker-employee of DeMoon. These meetings led to the submission of a $1,575,000 offer to purchase the property by Cinman and Brodsky in a letter dated February 12, 1981. Caliendo sent the letter at Cinman's direction. The letter contained the following sentence: "If these terms of [sic] *** [are] acceptable to you and your Board of Directors, a formal contract to purchase and earnest monies will follow." That offer, however, was not accepted by Reliance. Ross testified that during negotiations, he informed Cinman that any agreement arrived at would have to be submitted first to the Federal authorities for approval because of the supervisory situation. Cinman stated that Ross had represented that he had full authority to sell the property.

Cinman testified that during a telephone conversation on or about February 19, 1981, he and Ross agreed to the sale of the property and the leaseback to Reliance. The sale price was to be $1,620,000. According to Caliendo, Cinman called her on the same date to say that he had made an agreement with Ross. Cinman recited the terms of the agree-

ment to Caliendo. Caliendo testified that she called Ross, who confirmed the figures given to her by Cinman.

Caliendo testified that on February 23, 1981, she spoke to another real estate broker who informed her that he had received a copy of an offer for the same property from Ross in the morning mail. The other broker asked if the property was still on the market. Caliendo informed Cinman that Ross had sent an offer to another broker. Caliendo stated that Cinman was angered and told her that he would not deal with Ross until he received something in writing. Caliendo called Ross, who still wanted to go ahead with the agreement and stated that he would send a telegram to that effect. On February 24, 1981, DeMoon received a telegram signed by R.E. Fischer, secretary of Reliance. It stated:

> "I have received a call from Mr. Ross advising me to assure you that the proposed sale between Reliance Federal and yourself is in force. Kindly have contract and lease prepared by Friday, February 27, if possible."

Caliendo informed Cinman of the telegram, and he told her to proceed with preparation of the agreement.

On February 26, 1981, Caliendo hand delivered to Ross a three-page letter prepared by her and dated February 25. The letter purported to confirm the terms arrived at in the telephone conversation between Ross and Cinman. The letter described the property and included the following terms: a sales price of $1,620,000; a down payment of $340,000 consisting of a $100,000 payment at closing and $240,000 to be paid within 90 days of closing; a $1,280,000 mortgage from Reliance at 12¼% interest to be amortized over 29 years; a commitment fee of $25,600 and an option for Reliance to buy back the property at the end of 10 years for $2,050,000. The letter provided for the leasing back of the property to Reliance for a 10-year period if the buy-back option was exercised by Reliance and a 20-year period if it was not exercised. Rent for each of the 20 years was set forth in the letter. The letter also stated as follows:

> "Having been engaged in negotiation since late October of 1980, I am sure all parties are most anxious to consummate this transaction; therefore, time being of the essence, formal Contracts to Purchase, and Lease Agreements will follow at the earliest possible date."

The following sentence was at the bottom of the letter. "The above written terms are hereby acknowledged and approved, and accepted this 26th day of February, 1981." Underneath that sentence is the signature of Ross.

Cinman signed the letter on March 1, 1981. The letter contained a

signature for Brodsky, but Brodsky did not sign the letter and Cinman did not sign on behalf of Brodsky.

The letter did not mention the other tenants on the property and failed to mention leases or which party would receive the rents. There was no mention of utilities, taxes, or insurance for the building. Cinman stated that these details were to be handled by "boiler plate" by his attorney.

On March 13, 1981, the board of directors of Reliance wrote the FHLBB in response to a supervisory letter of January 20, 1981. The board informed the FHLBB that an offer for sale and leaseback of the Reliance property was presently in the hands of the board's legal counsel.

On March 16, 1981, Cinman informed Pulia, his broker, that his attorneys would be taking longer than anticipated to prepare the formal documents. Cinman requested Pulia to inform Ross that, if necessary, Cinman and Brodsky were willing to make an earnest money deposit in an escrow account. Ross told Pulia that such a deposit was not necessary.

On March 26, 1981, Ross and Caliendo met with another prospective purchaser of the subject property. Ross stated that the Reliance property was back on the market. The third party subsequently submitted an offer which was taken under consideration by Reliance and eventually rejected.

On April 9, 1981, Cinman's attorney advised Ross of Cinman's intention to consummate the sale and work was proceeding on the documents.

On April 10, 1981, Ross gave Caliendo sample contracts to deliver to Cinman's attorney. Ross directed Caliendo to inform Cinman's attorney that the documents had to be returned by April 17. However, Ross never received a signed contract. During that time, Caliendo showed the property to another prospective purchaser. Caliendo expected to receive a commission if the property had been sold to that party.

On April 17, 1981, Caliendo wrote Ross indicating that a telephone conversation had taken place between Ross, Cinman, Cinman's attorney, and her on April 16. The letter stated:

> "At that time it was mutually agreed that Mr. Cinman would arrange to have delivered to your personal secretary a revised contract and lease documents at the earliest possible date ***."

On May 25, 1981, Caliendo delivered a proposed mortgage, note, and lease to Ross. These documents had not been signed by Cinman. When Caliendo did not receive a reply from Ross, she called Ross' attorney. The attorney told Caliendo that the deal was off and that there

was no contract.

The aforesaid attorney was replaced by attorney Howard Miller. On June 6, 1981, Miller wrote Caliendo pointing out that she had been provided with contracts by Reliance on April 10, 1981, and that those contracts were to be signed and returned by April 17, 1981. Miller concluded that when those contracts were not signed by Cinman they were in effect rejected by him. When Cinman prepared and forwarded his own contract, this constituted a new offer which was unacceptable to Reliance and consequently was never executed. The letter went on to say:

> "Mr. Ross is continuing in his effort to make the best deal possible on behalf of Reliance Savings and Loan and will present any reasonable offers to the Board of Directors for their action and approval."

Miller was subsequently replaced by the law firm of Garvey and Hovey. On June 12, 1981, Caliendo wrote Ross stating that she had spoken to Hovey and that Hovey was reviewing the May 25 documents and would have an opinion for Cinman by June 15.

On June 16, 1981, Ross wrote Caliendo. That letter stated in relevant part:

> "I wish to mention again, as I have to you and to Mr. Cinman numerous times, that Cinman's contract is not the only contract that will be presented to the Board.
>
> As you know, in March, 1981, both you and Saul Pulia advised us that the Cinman transaction was cancelled. Saul Pulia offered to buy the building under the same terms which were offered by Cinman and Brodsky. You personally came to the office and advised that the Cinman deal was cancelled in March of 1981 and advised that you had other buyers. The latter part of March you did bring in purchasers by the name of Mr. Weiss and Mr. Fischman. You had sat in on the discussions between them in our office."

On June 18, 1981, Caliendo wrote Ross, stating in relevant part:

> "On March 28, 1981, I did verbally inform you that Mr. Pulia told me he thought the deal with Mr. Cinman had fallen through. However, since there was nothing in writing to this effect, and since I had not personally spoken to Mr. Cinman, I suggested that you get in writing a statement from Mr. Cinman that the deal was no longer in effect.
>
> * * *
>
> On April 10, 1981, in your office, you handed me contracts and lease documents to present to Mr. Cinman. You then had the

audacity to ask me to slip into my file a non-existent, back-dated letter to Mr. Cinman informing him that you were putting him on notice. I refused to do so because it was dishonest."

At a meeting of the Reliance board on June 19, 1981, Cinman's offer was formally rejected. The board found that an offer from 3M partners was acceptable in that it had been found acceptable by legal counsel. Ross stated that the 3M proposed contract was subsequently submitted to the FHLBB as a device to gain time since he knew it would not be found to be acceptable.

The sales price of the 3M offer was the same as that contained in the Cinman letter of February 25, 1981. However, the mortgage was 12% rather than 12¼%. The 3M offer provided for payment of $100,000 upon execution and $240,000 at the closing, while the Cinman letter provided for $100,000 at the closing and $240,000, 90 days after closing.

In late June 1981, Caliendo had another conversation with Hovey during which he stated that the Cinman deal was over because the documents submitted by Cinman on May 25 were unacceptable from a legal standpoint. On July 9, 1981, Hovey wrote Cinman's attorney and stated the documents submitted by Cinman were unacceptable to Reliance.

On July 21, 1981, Reliance received a letter from the FHLBB objecting to Reliance's proposed acceptance of the 3M offer. Thereafter, Reliance received another letter from the FHLBB indicating that if Reliance went through with such a sale, the FHLBB would require compliance with many conditions. Since the 3M offer was rejected by the FHLBB, the Reliance board requested the assistance of the Federal authorities in merging with another institution.

Reliance contends that the letter dated February 25, 1981, from Caliendo to Ross did not constitute a valid contract for the sale of the subject property and that it was error for the trial court to order specific performance of that purported agreement.

■ As a general rule, a writing which contains the essential terms of a contract but which contemplates the later execution of a formal document is a binding and enforceable contract if that is what the parties intended. (See *Inland Real Estate Corp. v. Christoph* (1981), 107 Ill. App. 3d 183, 437 N.E.2d 658.) However, where a party seeks specific performance of a contract, the law requires a greater degree of specificity than is demanded for other purposes. Where the court would be left to order further negotiations and where the parties have yet to reach agreement on essential terms, specific performance is not available. Specific performance requires as a prerequisite a clear and

precise understanding of the terms of the contract. (*Carver v. Brien* (1942), 315 Ill. App. 643, 43 N.E.2d 597.) There must be a description of the property, the price, the terms and conditions of sale, and the names and signatures of the parties to be charged. *Werling v. Grosse* (1979), 76 Ill. App. 3d 834, 395 N.E.2d 629.

In *Hintz v. Lazarus* (1978), 58 Ill. App. 3d 64, 373 N.E.2d 1018, plaintiffs signed "articles of agreement" which purported to sell a portion of their farm to defendant. Defendant agreed to lease the farm back to the plaintiffs for 10 years. The agreement, however, only established the rent for the first year; the document then provided that the parties would make a future determination as to the rent for the subsequent nine years. After reviewing the purported agreement, this court concluded that, since the leaseback arrangement was crucial and since the rent for the last nine years was left to subsequent negotiations, the omission of that essential item precluded enforcement of the contract. At page 67, the court stated:

> "Where the terms are not 'clear, certain and free from ambiguity and doubt,' an agreement is not an enforceable contract. [Citations.] While terms which the law implies need not be expressed in an agreement and their absence will not render an agreement uncertain, it has been stated that 'where the parties indicate an intention to leave some matters to be agreed on in the future, no implication with respect thereto is warranted.' [Citation.] When any essential term of an agreement is left to future negotiation, there is no binding contract." [Citations.] 58 Ill. App. 3d 64, 67, 373 N.E.2d 1018.

In *Sweeting v. Campbell* (1956), 8 Ill. 2d 54, 132 N.E.2d 523, the purported sales agreement provided for a down payment of $500 with the balance of $69,500 to be financed by obtaining a first mortgage of $39,500 in favor of the seller. The contract, however, did not specify a maturity date for either the first or the second mortgage. While affirming the trial court's refusal to grant specific performance of the sale contract to the buyer, our supreme court stated:

> "Specific performance of a contract for the sale of real property will be refused when the provisions relating to the terms of a mortgage to be given in connection with the transaction are so uncertain or equivocal in their meaning that the intention of the parties in regard thereto cannot be determined." 8 Ill. 2d 54, 57, 132 N.E.2d 523.

■ Having examined the testimonial and documentary evidence in this case, we believe that the letter of February 25, 1981, did not give rise to the level of an enforceable contract. We reach this conclusion for

several reasons, but primarily because Cinman and Ross continued to negotiate over a long period of time after the writing of the letter regarding certain material elements of the proposal. The letter did not include any reference to the lease, mortgage, or promissory note to be received by Reliance. Moreover, Reliance requested that contracts be prepared by February 27, and Cinman assumed responsibility for the preparation of the necessary documents. On April 10, 1981, Reliance furnished Cinman with sample contracts to assist him and requested that those proposed contracts be signed by April 17. Cinman never signed those documents. Cinman finally delivered unsigned contracts to Ross on May 25. Those contracts materially altered the terms contained in the proposed agreement. We believe that these facts conclusively establish that the prior letters and conversations constituted mere negotiations between the parties. It should be pointed out that Caliendo showed the property to other prospective purchasers after February 25 and that she stood ready to assert her claim of commission for its sale to other purchasers.

The letter of February 25 is not clear and definite enough as to material terms to warrant specific performance. The letter made no reference to the other tenancies in the building or to which party was to be responsible for those tenancies. Nor were there any provisions for utilities, taxes, or insurance for the building. The lease from Cinman to Reliance was an integral part of the purchase agreement. Yet the letter referred only to a triple-net lease, a term which was not defined by the letter or at any time during the trial.

It was established that the primary reason for the sale of the building by Reliance was to raise capital by means of converting an asset to cash and then leasing the building from the purchaser. Accordingly, the agreement required a mortgage, but the terms of the proposed mortgage were not outlined in the letter. Cinman conceded that the details of a $1,280,000 mortgage were very important and that he would want to see the proposed mortgage. Additionally, there was no provision made for the assignability of that mortgage.

Furthermore, the letter of February 25 was not signed by Brodsky, even though he was to be an equal partner with Cinman. It was established that Brodsky had given Cinman power of attorney, but Cinman stated that he did not sign the letter on behalf of Brodsky. In fact, pursuant to Reliance's motion, Brodsky was dismissed as a party-plaintiff at the close of plaintiff's case.

Ross testified that any contract which was ultimately agreed upon and executed still had to be approved by Reliance's board of directors and by the FHLBB. Cinman contradicted Ross' testimony and stated

that Ross had informed him that Ross had full authority to sell the property. However, Carl DeMoon, the primary real estate broker in the transaction, testified that as a member of the Reliance board, he attended meetings at which FHLBB officials informed the board it would need the Federal agency's permission to sell the property. We believe that it is highly unlikely that this information was not transmitted to Cinman. Additionally, the letter of February 12, 1981, from Caliendo to Ross demonstrates that she and Cinman knew that any proposed sale of the property had to be approved by Reliance's board of directors. We believe that the letter of February 25, 1981, did not constitute a valid sales agreement and that the trial court erred when it ordered specific performance pursuant to the letter of February 25.

Reliance also contends that DeMoon Realty is not entitled to receive a broker's commission because no contract for sale was concluded. Reliance argues in the alternative that the trial court erred in increasing the commission award from $45,000 to $162,000.

■■ Generally, a real estate broker is entitled to a commission if he finds or produces a buyer who is ready, willing, and able to make the purchase of the real property in question. (See generally *United Investors, Inc. v. Tsotsos* (1985), 132 Ill. App. 3d 175, 477 N.E.2d 40.) However, the so-called written commission agreement of February 12, 1981, which was introduced into evidence by DeMoon, stated that DeMoon would be entitled to a commission only "[i]f Reliance Savings and Loan accepts the sale-lease buy-back offer dated February 12, 1981," or only "[i]f any future transactions occur between Reliance *** and Messrs. Cinman and Brodsky or any of their associates involving any properties owned by Reliance *** or any of the subsidiaries." Moreover, Ross testified that it was orally agreed that DeMoon would keep as its commission any money received for the subject property over $1,575,000. We conclude that it was agreed between the parties that DeMoon would be entitled to a commission only if the sale of the Reliance property was consummated. Consequently, since we have determined that no contract for the sale of the subject property was formed, we are of the opinion that the trial court erred when it awarded a commission to DeMoon.

For the foregoing reasons the orders of the circuit court of Cook County granting Raymond Cinman specific performance and awarding DeMoon Realty a broker's commission are reversed.

Orders reversed.

WHITE and FREEMAN, JJ., concur.