JOSEPH PIONKE *et al.*, Plaintiffs-Appellants, v. LEO BEITZ *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—90—0723

Opinion filed March 21, 1991.

Samuel N. Warsawsky, of Chicago, for appellants.

Richard A. Cowen, of Cowen, Crowley & Nord, P.C., of Chicago, for appellees.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The plaintiffs, Joseph Pionke and Richard Wadzinski, filed an action seeking specific performance of their contract with the defendants, Leo and Ella Beitz, for the sale of the defendants' bowling business and the real estate from which the business was operated. Following a trial, the court found in favor of the defendants and denied the plaintiffs' claim for specific performance. The plaintiffs have appealed, contending that the trial court's judgment constituted an abuse of discretion. The issue before us is whether the parties' contract was sufficiently definite and unambiguous to support a judgment of specific performance.

The defendants own certain real estate located at 3325 North Southport in Chicago and operate a bowling business on the premises known as Southport Lanes, Inc. In late 1986 they decided to retire and advertised that the real estate and the business were for sale. Richard Wadzinski, a long-time patron of the bowling alley, and his cousin, Joseph Pionke, expressed an interest in buying the property and the business. Both parties agreed that the sale would be a package deal encompassing both the real estate and the business. The defendants told the plaintiffs that the price for the package was $375,000.

In late November of 1986, the defendants gave the plaintiffs a complete tour of the premises and showed them all of the personal property that would be included in the sale. In mid-December, the plaintiffs' attorney delivered to the defendants a letter of intent to purchase, which included the following paragraph with respect to the purchase of the business:

"All assets owned by Southport Lanes Inc. (this may be accomplished by purchase of the stock of the corporation or by pur-

chase of the assets depending upon the agreement of the attorneys for the parties)."

The parties' attorneys drew up two contracts—one for the sale of the real estate and the other for the sale of the business. Both contracts contained language indicating that they were mutually interdependent. The real estate contract provided:

"This Contract is further subject to the parties executing, performing and closing on an Agreement for the sale of the capital stock of Southport Lanes, Inc., an Illinois corporation. The failure of either party to execute and to close on the Agreement for sale of stock shall relieve the parties from closing on this transaction ***."

The agreement covering the sale of the business was drafted by the defendants' attorneys as a sale of stock and provided:

"The parties acknowledge that the execution and performance of the REAL ESTATE CONTRACT and the closing under this Agreement are mutually interdependent and shall occur simultaneously. The failure of the PURCHASER or SELLER, as the case may be, to close one transaction shall relieve the other party from closing the second transaction."

At the plaintiffs' request, the real estate contract was separated from the contract for the sale of the business and signed by the parties so the plaintiffs could begin the process of securing financing. The contract for the sale of the business was never signed by either of the parties. The real estate contract had a mortgage contingency clause that expired on March 20, 1987. The closing was to occur on March 31, 1987. The real estate contract showed the purchase price of the property to be $350,000, and the contract for the sale of the business showed a purchase price of $25,000. The plaintiffs applied for a loan at Lincoln Park Federal Savings & Loan Association.

Before the defendants signed the real estate contract, they questioned their attorney about the allocation of the $375,000 purchase price. It had always been their intention that 75% of the purchase price, or $281,250, would be allocated to the real estate and 25%, or $93,750, would be allocated to the sale of the business. This was significant to the defendants because they owned the business and Leo Beitz' mother owned the real estate. The defendants' attorney explained that the figure of $350,000 contained in the real estate contract was an accommodation to the plaintiffs to enable them to secure a higher mortgage. He further explained that a reallocation agreement would be signed later establishing the agreed-upon 75%/25% allocation between the real estate and the business. At trial, both the

plaintiffs and the defendants testified that such a reallocation of the purchase price was intended by the parties. However, no reallocation agreement was actually signed, and the defendants' accountant, Sharon Jones, testified that the reallocation would have tax disadvantages for the plaintiffs.

Much of the testimony at trial focused upon the contract for the sale of the business. As drafted by the defendants' attorney, Eugene Filice, the contract provided that the sale of the business would be structured as a sale of the stock of the corporation. In a letter to Filice dated February 19, 1987, the plaintiffs' attorney, Barry Holt, stated that he wanted the defendants to transfer all of the equipment and assets out of the corporation and to include these items as part of the real estate sale. This would allow the plaintiffs to benefit from a new depreciation schedule for the assets and equipment.

Filice testified that he consulted with the defendants' accountant, Sharon Jones, and that Jones strongly recommended against Holt's suggestion to transfer corporate assets from the business to the real estate. Jones testified at trial that structuring the sale in this manner would have negative tax consequences to the defendants, could trigger an Internal Revenue Service (IRS) audit of Leo Beitz' mother, who actually owned the real estate, and would cause the defendants to incur costs for an appraisal to determine the fair-market value of the corporate equipment and assets. According to Jones, if the equipment and assets were transferred out of the corporation and included as part of the real estate, this would be treated as a dividend to the defendants and taxed upon the basis of the fair-market value of the items transferred. Among the items owned by the bowling business were the cigarette machine, the ball racks, bar stools, the tables and chairs in the bar and banquet room, and certain bowling machinery that could not be replaced because it was no longer manufactured. The defendants' business is one of very few manually operated bowling businesses in the area. Jones estimated that the tax cost to the defendants would be $4,000. Jones explained that a transfer of the assets as suggested by Holt could be viewed by the IRS as a sham transaction and thereby trigger an audit. The plaintiffs on the other hand would realize a significant tax benefit by establishing a new depreciation schedule for the equipment and assets. Because of the negative consequences to the defendants, Jones never considered recommending a transfer of the assets and did not give a list of the equipment and assets owned by the corporation to the plaintiffs. Jones testified that it was to the plaintiffs' benefit to have as much of the purchase price as possible allocated to the real estate.

Filice testified that after consulting with Jones, he informed Holt that the defendants would not agree to the plaintiffs' suggestion of restructuring the business sale. According to Filice, Holt then asked about the possibility of structuring the sale of the business as a "Section 358" transaction. Upon checking with Sharon Jones, Filice learned that this was not possible because it would require a liquidation of the corporation. The corporation could not be liquidated because it held the liquor license which the plaintiffs needed to operate the business. Filice stated that he informed Holt that neither of the plaintiffs' suggestions regarding the restructuring of the business was acceptable to the defendants. Holt testified that Filice never informed him that the restructuring of the business sale was not possible and that neither side ever said that failure to agree on that issue would be a "deal breaker."

In mid-March of 1987, the plaintiffs were informed that their loan application had been rejected. The plaintiffs then approached the defendants with offers of "under the table" cash in order to lower the purchase price. The defendants rejected the offers, and the plaintiffs continued to seek financing.

On March 19 or 20, 1987, the plaintiffs asked for an extension of the mortgage contingency clause and the closing date. In a letter dated March 20, 1987, the defendants stated that they would agree to extend the financing contingency to March 31, 1987, and the closing to April 30, 1987, on the condition that "[a]ny and all additional costs relating to the business incurred by the Sellers by reason of the transaction not closing on March 31, 1987, (including renewal of liquor license, insurance and related items) shall be adjusted and credited to Seller as of the date of actual closing." The letter instructed the plaintiffs to sign and return it if its terms were acceptable. The plaintiffs did not sign the letter. The plaintiffs' attorney, Barry Holt, testified that the terms were acceptable for the most part, but that he was unsure of the meaning of "[a]ny and all additional costs." The defendants' attorney, Eugene Filice, testified that Holt told him that the plaintiffs considered the liquor license and insurance costs as corporate obligations and were unwilling to pay a portion of those costs.

The issue of whether or not the defendants orally agreed to extend the financing contingency and closing date was disputed at trial. The plaintiffs testified that they were told by Filice and by Leo Beitz that the financing contingency would be extended to April 2, 1987. Filice denied this, stating that he insisted on the March 31, 1987, closing date and told the plaintiffs' attorney only that he would try to "resurrect" the deal if the plaintiffs could obtain a written loan com-

mitment by April 2, 1987. The plaintiffs received an oral loan commitment on April 2 and immediately sent a letter to the defendants stating that the closing should be set close to April 30, 1987, and instructing the defendants to "have the assets transferred" out of the corporation and included as part of the real estate. On the same day this letter was sent, the plaintiffs received a letter from the defendants stating that the contract had expired of its own terms and that the deal was off because of their failure to close on March 31, 1987.

At the conclusion of the trial, the trial court found in favor of the defendants and denied specific performance on the grounds that the parties failed to reach a meeting of the minds on essential contract terms. The plaintiffs have appealed, contending that the court erred in denying specific performance because the parties had reached an agreement on all essential terms.

▪ The remedy of specific performance involves the sound discretion of the trial court to be determined from all the surrounding facts and circumstances of the individual case. (*Bliss v. Rhodes* (1978), 66 Ill. App. 3d 895, 900, 384 N.E.2d 512.) Before a court may grant specific performance of a contract, it must find that the terms of the contract are clear, definite and unequivocal. (*Kalkounos v. Four K's, Inc.* (1981), 94 Ill. App. 3d 1011, 1013, 419 N.E.2d 503.) As stated in *Cinman v. Reliance Federal Savings & Loan Association* (1987), 155 Ill. App. 3d 417, 423-24, 508 N.E.2d 239, 244:

> "[W]here a party seeks specific performance of a contract, the law requires a greater degree of specificity than is demanded for other purposes. Where the court would be left to order further negotiations and where the parties have yet to reach agreement on essential terms, specific performance is not available. Specific performance requires as a prerequisite a clear and precise understanding of the terms of the contract."

Where extrinsic facts and circumstances are controverted, questions involving the understanding and intent of the parties are factual determinations to be resolved by the trier of fact. *Nerone v. Boehler* (1976), 34 Ill. App. 3d 888, 891, 340 N.E.2d 534.

▪ In the case at bar, we cannot say that the trial court abused its discretion in denying specific performance. At the very least, the trial testimony amply supported the court's determination that the parties did not reach a meeting of the minds on how the sale of the bowling business would be structured. The defendants proposed that the sale be structured as a sale of the corporate stock. The plaintiffs' attorney, Barry Holt, then responded in writing that the plaintiffs wanted the defendants to transfer the corporate assets and equipment

out of the business and to include those items as part of the real estate sale. This would allow the plaintiffs to benefit from a new depreciation schedule for tax purposes. The defendants' attorney, Eugene Filice, testified that he consulted with the defendants' accountant and discovered that such a transfer of assets would have significant tax disadvantages for the defendants and could potentially trigger an IRS audit. Filice testified that he spoke with Holt and informed him that the transfer was not acceptable. At that time, Holt made another suggestion concerning the structuring of the business sale. After again consulting with the accountant, Filice informed Holt that neither proposal was acceptable to the defendants. Holt's testimony at trial conflicted with that of Filice. Holt testified that Filice never told him that the proposals regarding the structuring of the business sale were not acceptable. Regardless of whose testimony was believed by the trial court, it is undisputed that no further discussions took place and that the contract for the sale of the business was never signed. After the date for the closing had passed and the defendants declared the contract at an end, Holt sent a letter informing the defendants that financing had been secured and instructing them to "have the assets transferred." Thus, the evidence presented at trial was sufficient to support a determination that the parties had not reached agreement on the structuring of the sale of the business and that this was an essential term because of the tax ramifications for both parties. There is no dispute that the sale of the real estate could not occur without the simultaneous sale of the business. Under these circumstances, the trial court properly found that the contract lacked the degree of specificity necessary to support a judgment of specific performance.

The plaintiffs then make a number of arguments to the effect that the parties would have been able to agree had the defendants acted in good faith. They state, for example, that the defendants breached their duty of good faith and fair dealing by failing to give the plaintiffs a list of the assets owned by the corporation. According to the plaintiffs, had they been given the list they would have discovered that the most valuable assets were already part of the real estate, and they would have then agreed to structure the sale of the business as a sale of stock. By making these arguments, the plaintiffs fail to comprehend the nature of the remedy they are requesting. They are not suing the defendants for damages resulting from a breach of the defendants' duty of good faith and fair dealing. Rather, they are asking that the contract be specifically performed. As stated earlier, the remedy of specific performance requires a greater deal of specificity than is demanded for other purposes. (*Cinman*, 155 Ill. App. 3d at

423, 508 N.E.2d at 244.) Because the evidence supports the trial court's determination that the parties failed to reach a meeting of the minds on an essential contract term, it must be affirmed.

Affirmed.

JOHNSON and McMORROW, JJ., concur.